Filed 2/3/25  In re Y.Z. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Y.Z., a Person Coming Under the Juvenile Court Law. | B337304 (Los Angeles County Super. Ct. No. 20CCJP02356B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>Y.L.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Tara L. Newman, Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, Y.L. (mother) challenges the juvenile court's order terminating parental rights to her oldest daughter, Y.Z. (daughter). Mother argues the court erred in not applying the beneficial parental relationship exception to adoption. We find no error and affirm.

## BACKGROUND

Daughter is the second oldest of 11 children born to mother and her husband, D.Z. (father). At least 10 of mother and father's children have been declared dependents of the juvenile court and removed from their custody and care. Their youngest child was born in November 2023, while the underlying proceedings were pending. The record on appeal does not indicate whether that child also has been declared a dependent of the court.

The instant appeal is not the first time this family has been before us. In previous nonpublished decisions, we (1) upheld the removal of mother and father's oldest son (*In re W.Z.* (Mar. 11, 2022, B309689)), (2) upheld the jurisdictional findings and removal order as to mother and father's, at the time, youngest son (*In re M.Z.* (Dec. 2, 2022, B314485)), and (3) upheld termination of mother's parental rights to two of her children (*In re G.Z.* (Apr. 7, 2023, B320543)). Additionally, under *In re*

2

*Phoenix H.* (2009) 47 Cal.4th 835, we dismissed mother's and father's appeals of an order as to educational and developmental rights regarding one of their younger children (B317258). We also dismissed mother's and father's appeals of the juvenile court's order terminating parental rights to one of their younger children (B322390). Mother's appeal was dismissed under *In re Phoenix H.*, *supra*, 47 Cal.4th 835, and father's appeal was dismissed for failure to file an opening brief. Finally, we dismissed mother and father's writ petition filed in propria persona challenging the juvenile court's order setting a permanency planning hearing (B318240).

Rather than repeat the facts of these proceedings up through the time of parents' earlier appeals, we incorporate by reference our opinions in each of the earlier appeals listed above. We highlight the most recent and pertinent facts here.

## 1.    Daughter

When the underlying proceedings began in 2020, daughter was eight years old. She is now almost 13 years old. Daughter has not lived with or been in mother and father's custody and care for the entirety of the underlying proceedings. As we noted in our first opinion, at the start of the proceedings, daughter "was 'quiet and timid.' Initially, she indicated someone in the home had inappropriately touched her, although she would not specify how or who. In later interviews, the oldest daughter wavered between denying anyone had touched her inappropriately and specifying she was 'sexually touched on her breast and groin area by an adult male' who lived in her home and provided food, clothes, and other basic needs. The oldest daughter's teeth were visibly discolored and full of cavities." (*In re W.Z.*, *supra*, B309689.)

In May 2022, after four other placements, daughter was placed with her current caregivers, who are her prospective adoptive parents (caregivers).  While with caregivers, daughter has made immense strides emotionally, developmentally, and academically.  Caregivers stated, "When she first arrived, [daughter] was quiet, closed off, and seemed like she wanted to hide/not be seen."  She also expressed anxiety about catastrophic events happening.  After six months with them, caregivers reported daughter had "come out of her shell."  She hummed to herself, was "no longer quiet as a mouse," became more flexible with her schedule, and was comfortable enough to show caregivers "her grouchy, grumpy, moody, and sullen sides."  After 22 months, caregivers described daughter as "talkative, quirky, intelligent, engaging, loves to ask questions or crack a joke, and loves to laugh" and stated "she now sings to herself, she works on crafts, she draws, and reads on her own."  Caregivers said daughter was relaxed in their home and "now claims ownership of her room and bathroom as she has developed an increased sense of permanency," which was lacking when she first arrived at caregivers' home.  Caregivers also explained daughter's academic skills had greatly improved while in their care, she had made friends at school, and she had formed relationships with caregivers' family, becoming "an integral part of our extended families."  Caregivers had "developed a strong bond with her and her attachment has grown such that she is now calling us mom and dad."

The Department similarly reported daughter was "thriving" in caregivers' home.  She was happy, stable, and bonding with caregivers.  She "appeared relaxed and smiled easily."  If she could not return to her parents, daughter wanted

4

to stay with caregivers permanently. Daughter was sad not to reunite with her family, but after five months with caregivers, daughter wanted to be adopted by them. As time went on, daughter repeatedly and consistently "verbalized desire to be adopted by the caregivers." In July 2023, the Department reported, "[Daughter] is an integral part of the family unit and the character of their relationship appears to be beneficial to the well-being of the child, and the family as a whole."

Daughter participated in and benefited greatly from individual therapy. Her therapist stated, " 'I can support [daughter] in many ways including identifying feelings, but adoption is a very specific issue because her birth mother [mother] is involved too much.' " Daughter also met with an adoption therapist. By August 2023, daughter had reached her individual treatment goals and was "deemed to have stabilized" such that her individual therapy concluded. She continued to see the adoption therapist.

**2.    Mother and Father**

In violation of multiple court orders, father continued to post confidential and sensitive case information online. More than once, the juvenile court found father in contempt of court. Additionally, mother and father continued to assert their outrageous accusations of persecution and victimhood.

Mother did not separate herself from father. They continued to live together and have children together. During the pendency of the underlying proceedings, mother gave birth to five children, including most recently their 11th child in November 2023.

### 3. Caregivers

Caregivers wanted and were approved to adopt daughter. They already had applied to adopt her youngest brother who was born during the pendency of the underlying proceedings (son), with whom daughter had a strong bond, and for whom mother and father's parental rights already had been terminated. Caregivers explained they would have applied earlier to adopt daughter, but her immigration status had caused uncertainty. Daughter's case was complicated and delayed by difficulties in obtaining her birth certificate (she and her older brother were both born in China) and necessary coordination with immigration procedures and services.

### 4. Visits

Mother visited with the children regularly.[1] Visits generally went well and were always monitored. During visits, mother interacted with and cared for her children appropriately. The Department reported, "In general, the mother has had quality time with her children during the visitations." On multiple occasions, the Department reported mother, daughter, and two of daughter's siblings had "maintained [a] close relationship, as evidenced by their communication and interaction," and "it appeared that the mother could parent and discipline the children properly." On one occasion in June 2022, however, father was present and refused to leave. He and mother insisted caregivers were both forcing daughter to wear prescription glasses and abusing infant son. Eventually mother called 911 and son was taken to a hospital, where mother and

---

[1] As of mid-2022, after the juvenile court restricted father's visitation and ordered that he not visit at the same time as mother, father no longer visited with the children.

father continued to repeat their concerns and father claimed caregivers could be poisoning son. A doctor examined son, conducted a blood test, and found him to be "healthy without any concerns."

In June 2023, father suffered a "challenging medical condition," causing mother to cancel visits for months while she cared for father.[2] Mother also was pregnant with her 11th child at the time. Mother resumed her visits in January 2024. However, by March 2024, mother again stopped visiting with her children because her work schedule became more demanding following father's medical issues.

**5.  Termination of Parental Rights and Appeal**

On March 7, 2024, the juvenile court held daughter was adoptable and the beneficial parental relationship exception to adoption did not apply. The court explained that, although mother had "maintained regular visits with [daughter] and the visits have been positive," "there were a string of missed visits based on mother's other obligations. She does have to take care of father at this time." The court held neither mother nor father had shown that daughter would benefit from a continued relationship with the parents or that termination of the parental relationship would be detrimental to daughter. The court found the benefit to daughter of permanency through adoption outweighed any harm that might result from terminating the parental relationship. Accordingly, the court terminated mother's and father's parental rights to daughter.

Mother appealed the court's March 7, 2024 order terminating parental rights. Father did not appeal.

---

[2] According to a statement by mother's counsel below, father appears to have suffered a stroke.

7

## DISCUSSION

**1.    Applicable Law**

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies.  (Welf. & Inst. Code, § 366.26, subds. (b) & (c)(1).)[3]  Here, it is undisputed daughter was likely to be adopted.  Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.

The exception mother raises is the beneficial parental relationship exception.  This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides:  "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

To establish this exception, mother must prove the following three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)  "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]  By making this decision, the trial court determines

---

[3] Undesignated statutory references are to the Welfare and Institutions Code.

8

whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Id.* at p. 633.) The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

## 2. Standard of Review

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review. On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception]. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion. As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

9

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### 3.    No Error

The parties agree mother satisfied the first element (regular visitation and contact with daughter) of the beneficial parental relationship exception. Although the juvenile court found otherwise, we assume without deciding that mother satisfied the second element (a relationship with daughter, the continuation of which would benefit daughter). We conclude,

10

however, the juvenile court did not abuse its discretion in determining mother failed to establish the third element.

As noted above, the third element requires the juvenile court to "decide whether it would be harmful to the child to sever the [parental] relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Although the loss of a parental relationship may cause detriment to a child, the question for the juvenile court is whether the countervailing positives the child gains in a permanent, stable home outweigh any such detriment. (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

Here, it was not an abuse of discretion to determine adoption by caregivers outweighed any detriment daughter might experience by losing her relationship with mother. By the time of the March 2024 permanency planning hearing, daughter had not been living with mother or father for almost four years. Close to two of those years daughter spent with caregivers, who were steadfast in their desire to adopt daughter and provide her with a stable home. Although at first daughter indicated she preferred to return home with mother and father, as time went on, she repeatedly and consistently expressed her desire to be adopted by caregivers, who she came to call "mom and dad." It is undisputed daughter flourished emotionally, developmentally, and academically while in their care.

11

Although as mother points out on appeal she and daughter shared a relationship, the record amply supports a finding that their relationship was not of the type or character that would warrant foregoing adoption. Mother never progressed past monitored visits with daughter. She also never distanced herself from father, and in fact continued to have children with him and continued to espouse similarly paranoid beliefs as him. As we have noted in previous opinions, mother's reliance on and connection to father impeded her ability to care for her children. Dr. Wen (who performed mother's and father's mental health evaluations) opined mother was " 'unable to independently care for her children without relying on her husband' " and " '[t]he impedance by [father] will likely pose mental health and safety concerns for any minors under their care.' " (*In re G.Z.*, *supra*, B320543; *In re M.Z.*, *supra*, B314485.) Finally, for months leading up to the permanency planning hearing and termination of parental rights, daughter saw mother only a handful of times because mother canceled visits due to father's illness, the birth of their 11th child, and her work schedule. There is no indication in the record that this decrease in visits with mother negatively impacted daughter.

We conclude it was not an abuse of discretion for the juvenile court to find the benefits and security of adoption by caregivers outweighed any harm from terminating mother's parental relationship with daughter. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Thus, the juvenile court did not err when it held the beneficial parental relationship exception to adoption did not apply.

## DISPOSITION

The juvenile court's March 7, 2024 order is affirmed.

NOT TO BE PUBLISHED.


                                        LUI, P. J.

We concur:



ASHMANN-GERST, J.



RICHARDSON, J.